IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

JAY R. McNUTT                                                                                    PLAINTIFF

v.                                     Civil No. 09-3040

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                                       DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Jay McNutt, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.    Procedural Background**

The plaintiff protectively filed his application for DIB on March 19, 2007, alleging an onset date of March 9, 2007, due to anxiety disorder, major depression, obsessive-compulsive disorder ("OCD"), bipolar disorder, memory and concentration problems, and problems with his left leg status post spiral fracture and surgical repair.  (Tr. 48, 90, 130, 139, 166, 200, 202). Following denials of his application at the initial and reconsideration levels, plaintiff then made a request for a hearing by an Administrative Law Judge (ALJ).  (Tr. 41-42).  An administrative hearing was held on September 18, 2008.  (Tr. 6-39).  Plaintiff was present and represented by counsel.

At this time, plaintiff was 53 years of age and possessed a high school education. (Tr. 121). He had past relevant work ("PRW") experience as a machine worker in both the Coast Guard and the private sector. (Tr. 11-12, 114, 121-128).

On December 18, 2008, the ALJ found that plaintiff's depression, bipolar disorder, and anxiety were severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 48-49). After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels that did not involve driving; working near unprotected heights and dangerous machinery; climbing scaffolds, ladders, or ropes; balancing; and, requires only occasional climbing of ramps and stairs. (Tr. 50). He was also limited to performing routine and repetitive jobs having few variables and requiring little judgment; jobs that could be learned by rote; jobs involving only non-complex, simple instructions; jobs involving concrete, direct, and specific supervision; and, jobs requiring only superficial contact, incidental to work, with the public and co-workers. With the assistance of a vocational expert, the ALJ found plaintiff could still perform work as a hand packager, kitchen helper, poultry deboner, and poultry eviscerator. (Tr. 53-54).

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on May 8, 2009. (Tr. 1-3). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 8, 11).

## II. **Applicable Law**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

3

### A.     The Evaluation Process:

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III.    Discussion

Of particular concern to the undersigned is the ALJ's determination that plaintiff's OCD was a non-severe impairment. An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. *See Bowen v. Yuckert,* 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *id.* at 158, 107 S.Ct. 2287 (O'Connor, J., concurring); 20 C.F.R. § 404.1521(a). If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two. *Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir.2007).

The relevant evidence reveals as follows. On March 2, 2007, plaintiff was admitted to the VA inpatient unit for increased depression, suicidal thoughts, anxiety, OCD, and paranoid behaviors. (Tr. 226-247, 249-272). He stated that he "went into deep anxiety and depression

4

feeling suicidal and thinking of shooting himself with the gun." Plaintiff admitted to dealing with depression his entire life, but stating that his symptoms had worsened after he was fired from his job for not meeting work standards. They said he was too slow because he was paying unnecessary attention to details and always trying to be perfect. Initially, plaintiff did well, but began worrying about everything. He obsessed over his job and house and felt guilty for making bad decisions. Plaintiff put his house up for sale, but tried to burn it down because it reminded him of his failures. His girlfriend took him to his primary care physician and got him started on Prozac and a sleep aid. He felt slightly better with improved energy and was able to sleep off and on. However, after a few days, his mood swings worsened, his thoughts began to race, and he got antsy. Plaintiff obsessed over things, stating he was unable to get his girlfriend on the phone and thought she had slammed the phone down on him. He began thinking she was angry with him and started experiencing suicidal thoughts with the intent of "checking himself out with a gun." Plaintiff's refusal to give his gun away led to his referral to the hospital. He reported no prior psychiatric admissions, but did give a history of a head injury in high school with loss of consciousness and amnesia for three days. Plaintiff believed his personality changed after this injury. Plaintiff also admitted to asking Jesus for answers and using a flip of a coin to get the answer. However, he found himself repeatedly flipping the coin and unable to stop. Plaintiff reported paranoid thoughts, thinking he was being watched and sated he would look out the windows of his house repeatedly. He also admitted to being a perfectionist to the point of compulsion. Dr. Ghazala Ahmed noted that his mood and affect were depressed and anxious, his speech was rapid but not pressured, and his thoughts were somewhat tangential. His insight and judgment were fair and plaintiff voiced his desire to get better. Dr. Ahmed diagnosed him

5

with major depressive disorder with psychotic features, rule out OCD, and rule out bipolar disorder. He then assessed plaintiff with a GAF of 28. Dr. Ahmed prescribed Seroquel (generic Quetiapine) and discontinued the Prozac. (Tr. 226-247, 249-272).

On March 3, 2007, plaintiff was social and polite with his peers. (Tr. 219-226). Nurses's notes indicate that his affect and mood were both brighter and he was noticeably less anxious. His girlfriend came to visit on the unit, so he was quite chipper. He spent the latter part of the evening watching television with his peers. Upon observation, plaintiff appeared relaxed and at ease. He denied the presence of suicidal ideation and his speech was no longer pressured. Plaintiff told the nurse that he had slept uncommonly well the previous night since being prescribed Quetiapine. He was clearly relieved to be getting help with his problems. (Tr. 219-226).

On March 4, 2007, plaintiff stated that he felt like he was going into a trance, being off of Prozac. (Tr. 213-218). He felt this was something he would have to deal with the rest of his life. Plaintiff talked at length about the events that led up to his hospitalization, including trying to set his house on fire. He felt that his house was such a burden that if he burned it down and made it look like an accident, he could be rid of it. However, it was not until his girlfriend asked him what he had been doing all day that he realized what he had been doing and how crazy it was. He also revealed that he was a recovering alcoholic, having been sober for nine months. Although he did not mention using marijuana, plaintiff's urine analysis was positive for this as well as benzodiazepines. He had previously been prescribed ten Temazepam caplets, a benzodiazepine, by his primary care physician. Due to plaintiff's continued suicidal ideations, Dr. Newberry increased his Quetiapine dosage. (Tr. 213-218).

On March 5, 2007, plaintiff was seen with the treatment team. (Tr. 205-213). He reported feeling very anxious the previous day with racing thoughts and suicidal ideation. Plaintiff stated that he felt helpless and began thinking he would never get better and should not stay in the hospital. However, after speaking to the staff and taking Ativan, he felt better and decided to stay in the hospital. His insight and judgment were noted to be fair. Later in the morning, plaintiff attended and participated in unit activities. He was observed interacting some with his peers and related that he did feel better. (Tr. 205-2). Plaintiff also participated actively and positively in a therapeutic music group. He displayed no acute distress or homicidal or suicidal ideation. (Tr. 205-213).

A psychiatric nursing note dated March 6, 2007, revealed that the Quetiapine was helping plaintiff. (Tr. 195-201). He was pleasant, calm, and compliant. Plaintiff stated he had read the patient handbook, which had also helped. The nurse indicated that plaintiff ruminated over the same issues and would ramble on in group if not redirected. He reported less confusion and appeared to be doing well and interacting with his peers. (Tr. 195-201).

On March 7, 2007, plaintiff indicated that he could tell a definite difference between Prozac and Seroquel. (Tr. 192-193, 329-334). He continue to take Ativan as needed, stating that he felt anxious around noon. Plaintiff was still a little nervous about discontinuing the Ativan, but Dr. Ahmed discussed with him the possibility of adding low dosage Seroquel to be taken on an as needed basis. He was pleased with the affect of Seroquel and agreed to try it. Plaintiff stated that the racing thoughts had stopped and he could think clearly. He was still somewhat OCD, needed reassurance several times, and might need an SSRI for OCD in the future, once his bipolar disorder was stabilized. Dr. Ahmed noted that the suicidal thoughts were fleeting and

7

he was not dwelling on them. He diagnosed him with bipolar disorder mixed with improving psychiatric symptoms and OCD. Dr. Ahmed indicated that they would continue his current care. He advised plaintiff to discontinue the Ativan and prescribed Seroquel in its stead. He also indicated that he would prescribe Klonopin for a few weeks, if plaintiff remained anxious. (Tr. 192-193, 329-334).

On March 8, 2007, plaintiff participated in wrap-up group, therapeutic music group, and ate dinner with his peers. (Tr. 321-329, 407-410). He found a book in the TV room that interested him, so he spent a great deal of time reading. Plaintiff also met his goal of shaving and appeared well-groomed. He voiced worries that he might start doing something "crazy" again like setting his house on fire. However, he said he felt good and stable. Plaintiff had taken his as needed dosage of Seroquel only once the day before. He stated that he was glad to find out about his chemical imbalance and wanted to stay on medication. As plaintiff was going to be discharged the following day, he was told to get with Dr. Ahmed if he felt hopeless, worthless, or experienced a loss of pleasure in usual activities. (Tr. 321-329).

On March 9, 2007, plaintiff was alert, oriented, and smiling with a bright mood. (Tr. 247, 280-283, 308-320, 337-339, 360-369, 383-384, 399-407). He was mildly anxious about going home. His thought processes had slowed to a more normal pace and he acknowledged feeling "much better." He indicated that the medications were working well for him. As such, plaintiff was discharged home to follow-up with outpatient care. Dr. Ahmed noted that plaintiff's prognosis was poor to fair secondary to his chronic mood disorder, anxieties, and unemployment. His discharge GAF was 56. (Tr. 247, 280-283, 308-320, 337-339).

On March 15, 2007, plaintiff failed to attend the transitions group. (Tr. 307, 360, 398). However, he did phone the VA and indicated that he was doing fair and would keep his next appointment. The nurse assisted him with travel and gave him the DAV number. He was encouraged to keep a journal/calendar of good days and bad days for his doctor. Plaintiff rated his depression as a 5 on a 10 point scale. (Tr. 307).

On March 21, 2007, plaintiff was treated by his primary care physician, Dr. Shawn Bogle. (Tr. 300-307, 355-359, 379-380, 393-398). Plaintiff stated that he really did not have any physical health problems that he was aware of. He reported a history of depression and stated that he was taking medication for this. Screening for depression and PTSD were both positive. A physical examination was normal. Dr. Bogle diagnosed plaintiff with bipolar and depression. He advised him to continue on his current medications, acknowledging that his next appointment with the psychiatrist was the following week. Dr. Bogle noted that plaintiff's Triglycerides were a little high, but that was the only abnormality. (Tr. 300-307).

On March 27, 2007, plaintiff had a follow-up appointment with Dr. Robert Stilwell, a psychiatrist at the VA Mental Health Clinic. (Tr. 296-299, 350-354, 389-392). Plaintiff was doing well on Quetiapine. He fidgeted some and reported difficulty sleeping, but was clear, alert, cooperative, and friendly. No evidence of a formal thought disorder was noted. He planned to sell his house and move closer to his children where there were more jobs. Dr. Stilwell diagnosed him with bipolar disorder and assessed him with a GAF of 41. He increased plaintiff's dosage of Quetiapine and asked him to return in three to four weeks. (Tr. 296-299).

On April 24, 2007, plaintiff was sleeping better on the Quetiapine. (Tr. 290-293, 347-350, 385-389). He was alert, oriented, pleasant, cooperative, made good eye contact, was neatly groomed, and was ambulatory. No physical limitations were noted. (Tr. 388). Dr. Stilwell diagnosed plaintiff with bipolar disorder and tendonitis in his right arm. He also assessed him with a GAF of 46. No medication changes were made. (Tr. 290-293).

On June 7, 2007, plaintiff saw Dr. Stilwell. (Tr. 287-289, 345-346). Plaintiff reported generally doing well and sleeping well on the increased Quetiapine dosage. However, he stated he could not sleep without this medication. Dr. Stilwell noted that plaintiff was clear, calm, alert, cooperative, and friendly. No evidence of a formal thought disorder was evident and plaintiff denied suicidality. However, he did mention seeing shadows out of the corner of his eye. Dr. Stilwell diagnosed him with bipolar disorder and tendonitis in his right arm. He also assessed him with a GAF of 46. Plaintiff was advised to continue the Quetiapine for agitation and to return in six months. (Tr. 287-289, 345-346).

On June 27, 2007, plaintiff underwent a mental diagnostic evaluation with Dr. W. Charles Nichols. (Tr. 166-171). Dr. Nichols was provided plaintiff's discharge summary from the VA hospital from March 2007. Plaintiff denied working since November 2006, although he admitted to applying for various positions since that date. Plaintiff reported a history of "going off the dep end" every four years or so. He indicated that he was fired from his last job and became extremely depressed, to the point that he was hospitalized. Plaintiff felt as though his mind had actually snapped. Although he had been able to recover from depression without assistance in the past, he was unable to do so this time. He put his house up for sale and then tried to burn it down. Plaintiff also described being very obsessed over details to the point it

10

interfered with his work performance. He stated that he got into a "crazy habit" of flipping a coin to "tell the future." In addition, plaintiff complained of mood swings with recurrent periods of severe depression and "bad" suicidal thoughts. He reported periods of happiness followed by suicidal episodes following disappointment. During periods of depression, plaintiff described feeling very down, insomnia, weight loss, lack of appetite, loss of motivation and energy, and feeling like a failure.

Plaintiff denied a history of counseling, except for briefly as a juvenile in court-ordered services. His only psychiatric hospitalization occurred in March 2007. Although he denied a history of suicidal attempts, he acknowledged experiencing recurrent and intense suicidal thoughts. Most recently, plaintiff had a friend keep his gun due to suicidal thoughts. Plaintiff was currently receiving mental health treatment through Dr. Stillwell. Plaintiff reported a history of excessive alcohol use that had stopped approximately one year prior. He denied use of any illegal drugs, in spite of the VA discharge summary stating he tested positive for marijuana. Plaintiff did admit to smoking 20 cigarettes per day. His hygiene and grooming were both excellent, and he was appropriately dressed. No posture or gait abnormalities were observed. Plaintiff was pleasant and very engaged during the interview. He had no signs of guardedness and seemed to enjoy the opportunity to talk about his history and problems. Dr. Nichols noted that plaintiff's mood was "good" most days during the previous three to four months, but very depressed before that. His affect was euthymic with full range of expression and appropriate to content. Plaintiff speech was fluent and sometimes rapid in pace, but his articulation was clear and his volume moderate. His thought process became slightly circumstantial at times, but he responded well to curbing. Plaintiff denied a history of delusional thoughts, current suicidal or

11

homicidal ideation, or bizarre obsessions. Dr. Nichols diagnosed him with OCD, major depressive disorder in partial remission, and alcohol dependence in sustained full remission. He assessed him with a GAF of 65. (Tr. 166-171).

Given the fact that plaintiff was diagnosed with OCD and was fired from a job because of his OCD tendencies, we believe the ALJ erred in concluding that the OCD was a non-severe impairment. The mere fact that the medication may have improved his symptoms does not mean his OCD symptoms were non-severe and that they would not impact his ability to perform work-related activities. It seems clear to the undersigned that the OCD was significant enough to at least more than minimally impact plaintiff's ability to work, rending it a severe impairment. Accordingly, we believe remand is necessary to allow the ALJ to reconsider the severity of plaintiff's OCD. As there is no RFC assessment in the file from any of plaintiff's treating doctors, we believe the ALJ should obtain both a physical and mental RFC assessment from plaintiff's treating doctors prior to rendering an opinion on remand.

## IV.   Conclusion

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 29th day of June 2010.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)